# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "*Agreement*") is made and entered and effective as of March 6, 2019 (the "*Effective Date*"), by and between **OMORFIA VENTURES, INC., a Tennessee corporation** (the "*Purchaser*") and **POSH BRIDAL COUTURE, LLC, a Minnesota limited liability company** (the "*Seller*").

WHEREAS, Seller owns and operates a luxury bridal boutique known as Posh Bridal Couture located at 209 10th Avenue South #231, Nashville, Tennessee 37203 (the "*Business*"); and

WHEREAS, Seller owns certain Assets (as defined below) used in the Business and wishes to sell them to Purchaser, and Purchaser wishes to acquire them, on the terms and conditions set forth herein;

NOW, THEREFORE in consideration of the premises and the mutual promises made herein, the parties agree as follows:

1.    Sale of Assets. On the Closing Date (as defined below), Seller hereby agrees to sell to Purchaser, free from all liabilities and encumbrances, and Purchaser hereby agrees to purchase and acquire from Seller, in exchange for the Purchase Price described below, all right, title and interest in and to (i) the furniture, fixtures, and equipment listed on **Exhibit A**, (ii) the phone number (629) 888-4532 (the "*Phone Number*"), (iii) the Facebook page located at https://www.facebook.com/pbcnashville (the "*Facebook Page*"), (iv) all lists, records, and other information pertaining to accounts and referral sources of the Business, customers, prospective customers, suppliers, and prospective suppliers of the Business, whether evidenced in writing, electronic data, or otherwise ("*Business Records*"), and (v) all goodwill, customer records and contracts, materials and supplies, inventory, transferrable licenses, leasehold interests and improvements, contract rights, Software (as hereinafter defined) and Software licenses, trade secrets, and intellectual property, including a license to use the name Posh Bridal Couture for a period of thirty-six (36) months from the Closing Date (collectively, the "*Assets*"). Such trade secrets and intellectual property, together with the Phone Number, Facebook Page, and Software, are referred to herein collectively as the "*Intellectual Property*."

2.    Assumption of Liabilities. Purchaser does not and will not assume any liabilities of Seller or the Business incurred prior to Closing, whether accrued, absolute, contingent, or otherwise, whether known or unknown, whether due or to become due, whether or not related to the Business or the Assets, and regardless of when or by whom asserted, including, but not limited to, all accounts payable accruing prior to Closing, regardless of when payment is due.

EXHIBIT
1

3.  Purchase Price; Allocation; Funding.

(a)  Purchase Price and Allocation. Purchaser and Seller acknowledge that certain federal and state income tax laws may be applicable to the transactions contemplated herein (the "**Transaction**"). The parties acknowledge that each may be required to report this Transaction to the Internal Revenue Service and allocate the Purchase Price among the classes of assets involved. The parties have agreed upon the allocation of the purchase price listed below. Purchaser and Seller shall report, act, and file tax returns (including without limitation IRS Form 8594) in all respects and for all purposes consistent with the foregoing allocation. Neither Purchaser nor Seller shall take any position that is inconsistent with such allocation unless required to do so by a "final determination" within the meaning of Section 1313(a) of the Internal Revenue Code. The purchase price for the Assets (the "**Purchase Price**") shall consist of the following, payable as provided herein:

| | |
|---|---|
| Furniture, Fixtures, and Equipment | $80,000.00 |
| Inventory | $261,654.00 |
| Non-compete | $10,000.00 |
| Goodwill | $150,000.00 |
| Training | $10,000.00 |
| Total Purchase Price | $511,654.00 |

(b)  Deposit. Purchaser has paid a deposit of $10,000.00 (the "**Deposit**") that will be credited towards the Purchase Price at closing. The Deposit is held by Alliant Capital Advisors.

(c)  Seller Financing. Seller agrees to finance $75,000.00 of the Purchase Price (the "**Seller Financing**"), to be paid over 36 months, with annual interest of six percent (6%), in equal monthly payments of $2,281.65, pursuant to a Secured Promissory Note in the form attached hereto. The Purchaser's obligations under the Secured Promissory Note shall be secured by a Security Agreement, and guaranteed by Jennie M. Dickens.

(d)  Cash Payment. The Purchase Price, adjusted for the Deposit, Seller financing, prorations, and closing costs, shall be paid in cash at closing from Purchaser to Seller.

4.     Closing. The closing of the sale of the Assets (the "*Closing*") shall take place at the office of Todd Jackson Law, PC, 3326 Aspen Grove Drive, Suite 400, Franklin, Tennessee 37067 on March 6, 2019 (the "*Closing Date*"), or at such other time and place as Seller and Purchaser may mutually agree. At the Closing:

(i)     the Bill of Sale, substantially in the form attached hereto as Exhibit B, shall be executed by Seller and Purchaser;

(ii)     the Closing Statement, substantially in the form attached hereto as Exhibit C detailing the purchase price, prorations, and closing costs, shall be executed by Seller and Purchaser;

(iii)     the Secured Promissory Note, substantially in the form attached hereto as Exhibit D, shall be executed by Purchaser;

(iv)     The Security Agreement in the form of that attached as Exhibit E, shall by executed by Purchaser;

(v)     The Guaranty, in the form of that attached as Exhibit F, shall by executed by Mark Dickens;

(vi)     this Asset Purchase Agreement shall be executed by Seller and Purchaser;

(vii)     Purchaser shall pay the cash portion of the Purchase Price;

(viii)     Alliant Capital Advisors shall deliver the Deposit to Seller; and

(ix)     Seller shall disclose to Purchaser the user names, passwords, and other credentials and information necessary for the Purchaser to take control of the Website, Facebook Page, Phone Number, and other Assets as to which such information is relevant; and

At the Closing, the parties shall deliver such other documents and take such actions as may be necessary or appropriate to consummate the transactions provided for herein in accordance with the terms and conditions hereof. Purchaser and Seller acknowledge and agree that attorney Todd Jackson has prepared this Agreement and the other closing documents listed above as an accommodation to the parties hereto, at the direction of the Purchaser and Seller, and that Mr. Jackson does not represent either Purchaser or Seller, and neither Purchaser nor Seller has engaged Mr. Jackson as their attorney or considers him as such. Purchaser and Seller acknowledge that they have relied only on information, representations, and warranties given by Purchaser and Seller, and that Mr. Jackson has not reviewed any of the contracts, assets, financial information, or any other information exchanged directly between Purchaser and Seller. PURCHASER AND SELLER EACH ACKNOWLEDGE THAT THEY HAVE BEEN ADVISED TO SEEK THEIR

OWN INDIVDIUAL COUNSEL FOR PURPOSES OF DUE DILIGENCE AND PROTECTING THEIR RESPECTIVE INTERESTS IN THE TRANSACTION CONTEMPLATED HEREBY, AND THEY HAVE EITHER DONE SO OR MADE A CONSIDERD DECISION TO FOREGO SUCH INDIVDIUAL COUNSEL.

5.    Representations by Seller. For purposes of this Section 5, "Seller's knowledge," "knowledge of Seller," and any similar phrases shall mean the actual knowledge of Seller, after due inquiry of the employees of Seller. Seller warrants, represents, and covenants to Purchaser as follows:

(a)    Authority and Standing. Seller warrants and represents to Purchaser that Seller is a limited liability company existing and in good standing under the laws of the State of Minnesota, and qualified and in good standing in the State of Tennessee. It has full right, power and authority to execute, deliver and perform this Agreement and consummate the Transaction, and doing so will not violate any provision of law or contravene any provision of its Articles of Organization or other governing documents. This Agreement and the other agreements or instruments to which Seller is a party pursuant to this Agreement have been duly executed and delivered by it and constitute valid and binding obligations enforceable against it in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

(b)    Title. Seller is the sole owner of the Business and Assets and has good and marketable title to the Assets, and will transfer such title to the Assets to Purchaser free and clear of all encumbrances.

(c)    Computer Software. Seller does not own any computer software, databases, or the like used or held for use in the Business ("**Software**"). Seller holds, and all times has held, valid licenses to use all Software and it is in compliance, and at all times has been in compliance, with all terms and conditions of each such license. Other than unmodified, commercially-available off-the-shelf or downloaded Software, Seller does not use or hold for use in the Business any Software. There are no royalties or other payments owed by Seller for the use of any Software. Seller has made available to Purchaser true and complete copies of all licenses for Software, in each case as amended or otherwise modified and in effect, and each such license is valid and enforceable by Seller in accordance with its terms.

(d)    Intellectual Property. To Seller's knowledge, the Intellectual Property comprises all trade or brand names, business names, trademarks, service marks, copyrights, trade secrets, designs, patents, inventions, designs, confidential information, software, and other intellectual property necessary for the lawful and efficient operation of the Business as presently conducted. Seller's prior and current use of the Intellectual Property has not infringed, violated, diluted, or

misappropriated, and does not infringe, violate, dilute, or misappropriate, the intellectual property, proprietary rights, or trade secrets of any person or entity and there are no claims pending or threatened in writing by any person or entity with respect to the ownership, validity, enforceability, effectiveness, or use of the Intellectual Property. To the best of Seller's knowledge, no person or entity is infringing, misappropriating, diluting, or otherwise violating any of the Intellectual Property, and Seller has not made or asserted any claim, demand, or notice against any person or entity alleging any such infringement, misappropriation, dilution, or other violation.

(e)     Compliance With Laws. Seller has to its knowledge complied with all local, state and federal laws, rules and regulations relating to the Assets, and there are no outstanding violations thereof.

(f)     Taxes. Seller has paid all applicable taxes with respect to the Business and the Assets to the appropriate local, state and federal governments when due.

(g)     Pre-Existing Right to Acquire. Seller has not entered into a contract to sell, grant a security interest or otherwise transfer the Assets, or any portion thereof.

(h)     Litigation. To Seller's knowledge, no suits, judgments, actions, arbitration, governmental investigations, or administrative proceedings are pending against or affecting Seller in connection with the Business or the Assets and Seller has not been threatened with any suit, action, arbitration, or administrative proceeding with respect thereto. To Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any of the foregoing. Seller is not subject to or bound by any outstanding orders, judgments, or decrees of any governmental authority with respect to the Business or the Assets.

(i)     Privacy and Information Security. Seller is and at all times has been in compliance in all material respects with (i) all applicable requirements of the Payment Card Industry Data Security Standards ("*PCI-DSS*"), (ii) all applicable laws and regulations concerning payment card data, Social Security Numbers, or other sensitive personally-identifiable information of individuals (such data and information, "*PII*," and such laws and regulations, "*Privacy Laws*"), and (iii) the terms of any privacy policy ever posted on Seller's web site or otherwise published or delivered to any person. Seller has received no complaints alleging a failure to comply with PCI-DSS, a violation of any Privacy Law, or a failure to comply with any such privacy policy. After reasonable inspection, to Seller's knowledge, Seller has never experienced a data breach or other unauthorized use or disclosure of PII.

(j) <u>Financial Information; Legal and Tax Advice</u>. Seller has sought such accounting, legal, and tax advice as Seller has considered necessary to make an informed decision about entering into this Agreement. The financial information supplied to Purchaser by Seller is true and correct as of the dates of such information in all material respects, and is a fair and accurate presentation of the financial condition and results of operation of the Business as of such dates.

(k) <u>Absence of Undisclosed Liabilities</u>. To the best of Seller's knowledge, the Business has no obligations or liabilities except for liabilities described in financial information furnished Purchaser by Seller. Seller has no liability for breach of contract, tort, infringement, claim, lawsuit, or warranty.

(l) <u>Taxes</u>. Seller has timely filed or timely requested extensions to file those tax returns that are required to have been filed by Seller or, if not yet due, will timely file or timely request extensions to file all such tax returns for all taxable periods ending on or before the Closing Date, and all such tax returns are, or will be when filed, true, correct and complete in all material respects. Seller has paid to the appropriate governmental authority, or, if payment is not yet due, will pay to the appropriate governmental authority, all taxes whether or not reflected on the tax returns of Seller as due and payable for all taxable periods beginning on or before the Closing Date. Except in the case of a lien for ad valorem property taxes not yet delinquent, there is no unpaid tax that constitutes a lien upon any of the assets of Seller. No claim has ever been made by an authority in a jurisdiction where Seller does not file tax returns that Seller is or may be subject to taxation by that jurisdiction, and, to the best of Seller's knowledge, there is no basis for any such claim to be made. Seller has deducted, withheld, and timely paid to the appropriate governmental authority all taxes required to be deducted, withheld, or paid in connection with amounts paid or owing to any customer, employee, independent contractor, creditor, member, or other third person, and Seller has complied with all reporting and recordkeeping requirements with respect to such payment. To the best of Seller's knowledge, there is no dispute, audit, investigation, proceeding, or claim concerning any tax liability of Seller pending, being conducted, claimed, or raised by a governmental authority. Seller is not a person other than a "United States Person" within the meaning of the Internal Revenue Code.

(m) <u>True Statements</u>. Neither this Agreement nor the schedules and other documents furnished to Purchaser by Seller contains any untrue statement of a material fact or omits to state a material fact required to be stated in order to make such a statement not misleading.

(n) <u>Proceedings Affecting Access</u>. Seller has not been notified that there are any pending proceedings that could have the effect of impairing or restricting access between the Business and adjacent public roads and, to the best of Seller's knowledge, no such proceedings are pending or threatened.

(o)     Assigned Contracts. **Schedule 5(o)** sets forth a list of all existing equipment leases, service and vendor contracts that relate to the operation, management, or maintenance of the Business and Assets, and other contracts included in the Assets, if any (the *"Assigned Contracts"*). All such contracts are in full force and effect and are valid and binding on the respective parties thereto in accordance with their respective provisions. Neither Seller nor, to the best of Seller's knowledge, any other party thereto is in material breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Assigned Contract, and no event or circumstance has occurred that, with or without notice or lapse of time or both, would constitute a breach or an event of default by Seller or, to Seller's knowledge, any other party under any Assigned Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation of Seller or the loss of benefit by Seller thereunder. There are no disputes pending or threatened in writing under any Assigned Contract. Complete and correct copies of each Assigned Contract have been delivered to Purchaser.

(p)     Employees. To Seller's knowledge it is in full compliance with all applicable laws relating to the employment of the employees of Seller, including those relating to wages, hours, occupational health and safety, hazardous materials, employment standards, human rights, pay equity and workers' compensation. All amounts due and payable by Seller to its employees and independent contractors have been paid in full other than such amounts as may have accrued from the end of Seller's most recent payroll period through the Closing Date, all of which will be paid by Seller promptly following the Closing. There are no outstanding or threatened charges, complaints, or proceedings against Seller relating to unfair labor practices, occupational health and safety issues, or other employment matters and, to the best of Seller's knowledge, no basis exists for any of the foregoing. There are no wages, benefits or other rights or obligations that shall accrue or become an obligation of the Purchaser prior to Closing with respect to any employees of Seller.

(q)     Condition and Sufficiency of Assets. Any equipment, furniture, fittings, tangible personal property, and fixtures included in the Assets sold pursuant hereto shall be in working condition, subject to normal wear and tear, as of the date of the Closing. Seller makes no warranties with respect to the condition of such Assets other than as expressly set forth herein, including but not limited to warranties of merchantability or fitness for any particular purpose. Purchaser shall have the right and opportunity to inspect the Assets prior to the Closing and if Purchaser notifies Seller that there are any items that are not then in working condition, Seller may either (i) repair or replace the items prior to Closing, or (ii) supply a credit for the value of the items to Purchaser at Closing. Purchaser shall have an additional opportunity to re-inspect those items that have been repaired or replaced to determine that, as of the date of Closing, the equipment is in working condition. The Assets, together with the rights granted to Purchaser pursuant to

this Agreement, constitute all of the assets and rights used by Seller in the conduct of the Business prior to the Closing.

(r) Brokers. Except for the Broker (as hereinafter defined), the fee to which Seller will have paid at the Closing, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

All covenants, representations, and warranties made by Seller shall survive the Closing for a period of twelve (12) months.

6. Representations by Purchaser.

(a) As of the Closing Date, Purchaser warrants, represents, and covenants to Seller that Purchaser is a corporation existing and in good standing under the laws of the State of Tennessee. It has full right, power and authority to execute, deliver and perform this Agreement and consummate the Transaction, and doing so will not violate any provision of law or contravene any provision of its Charter or Bylaws. This Agreement and the other agreements or instruments to which Purchaser is a party pursuant to this Agreement have been duly executed and delivered by it and constitute valid and binding obligations enforceable against it in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Purchaser.

(b) Financial Information; Legal and Tax Advice. Purchaser has sought such accounting, legal, and tax advice as Purchaser has considered necessary to make an informed decision about entering into this Agreement.

(c) Financing. The Purchaser has and shall have on the Closing Date sufficient immediately available funds to pay the full payments to Seller as required by the terms hereof, to pay all related fees and expenses of Purchaser in connection with this Agreement and the transactions contemplated hereby, and to otherwise consummate the transactions contemplated hereby.

(d) Solvency. Immediately after giving effect to the transactions contemplated by this Agreement, Purchaser will be able to pay its debts as they become due and will own property which has a fair saleable value greater than the

amounts required to pay their respective debts (including a reasonable estimate of the amount of all contingent Liabilities). Immediately after giving effect to the transactions contemplated by this Agreement, the Purchaser will have adequate capital to carry on its businesses.

(e)     Access and Investigation. Purchaser and its representatives (a) have had access to and have been afforded full access to the books and records, facilities and officers, and other representatives of the Seller for purposes of conducting a due diligence investigation with respect thereto and have conducted, to Buyer's satisfaction, an independent due diligence investigation of the financial condition, results of operations, assets, liabilities and properties and projected operations of the Seller and its business, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied solely on the results of said due diligence investigation and on the representations and warranties of the Seller expressly and specifically set forth in this Agreement and any other document delivered in connection.

7.     Conditions Precedent to Closing.

(a)     Conditions in Favor of Purchaser. The obligation of Purchaser to consummate the Transaction is conditioned upon the following conditions precedent as of the Closing Date:

(i)     all representations and warranties of Seller shall remain true and correct;

(ii)     Seller shall have performed all of the covenants undertaken by Seller in this Agreement to be performed by Seller at or prior to Closing;

(iii)     Seller shall have delivered to Purchaser Seller's properly executed closing documents as listed in Section 4;

(iv)     there shall have been no material adverse change in the Business or the Assets; and

(v)     Purchaser shall have obtained a satisfactory lease for the Business premises.

(b)     Conditions in Favor of Seller. The obligations of Seller to consummate the Transaction contemplated herein is conditioned upon the following conditions precedent as of the Closing Date:

(i) all representations and warranties of Purchaser made herein shall remain true and correct;

(ii) Purchaser shall have performed all of the covenants undertaken by Purchaser in this Agreement to be performed by Purchaser at or prior to Closing;

(iii) Purchaser shall have delivered to Seller Purchaser's properly executed closing documents listed in Section 4; and

(iv) Purchaser shall have paid the Purchase Price to Seller.

(c) Termination. Either party shall have the right to terminate this Agreement if the other party fails to fulfill its conditions to Closing. If this Agreement is terminated due to the fault of Seller, the Deposit shall be returned to Purchaser. If this Agreement is terminated due to the fault of Purchaser, then the Deposit shall be promptly paid over to Seller as liquidated damages.

8.     Mutual Indemnification.

(a) Seller hereby agrees to indemnify and hold Purchaser and its members, officers, employees, agents, representatives, successors, and assigns (collectively, the "*Purchaser Indemnified Parties*") harmless from any and all liabilities, losses, claims, judgments, damages, expenses, and costs (including, without limitation, reasonable counsel fees and costs and expenses incurred in connection therewith) (collectively, "*Losses*") that a Purchaser Indemnified Party may suffer or incur by reason of the breach or inaccuracy of any of the covenants, representations, or warranties of Seller contained in this Agreement or in any document or instrument delivered pursuant to this Agreement and against liabilities or obligations of Seller arising on or before the Closing Date with respect to the Business or the Assets.

(b) Purchaser hereby agrees to indemnify and hold Seller and its employees, agents, representatives, successors, and assigns (collectively, the "*Seller Indemnified Parties*") harmless from any and all Losses that a Seller Indemnified Party may suffer or incur by reason of the breach or inaccuracy of any of the covenants, representations, or warranties of Purchaser contained in this Agreement or in any document or instrument delivered pursuant to this Agreement and against liabilities or obligations of Purchaser arising after the Closing Date with respect to the Business or the Assets.

(c) If any claim or demand is asserted against a Purchaser Indemnified Party or a Seller Indemnified Party (in each case, an "*Indemnified Party*") by a third party with respect to any matter under the indemnities set forth in this Section 8 (a "*Third Party Claim*"), the indemnifying party promptly shall give written notice and details thereof, including copies of all pleadings and the

pertinent documents, to the Indemnified Party. Within 15 business days of receipt of such notice, the indemnifying party shall either (i) pay the Third Party Claim either in full or upon a compromise agreed to by the Indemnified Party, or (ii) notify the Indemnified Party that the indemnifying party disputes the Third Party Claim and intends to defend against it, and thereafter so defend against it and pay any final judgment or award or settlement amount in regard thereto; provided, however, that no such settlement that would impose upon an Indemnified Party, or constitute an admission by an Indemnified Party of, any fault, liability, or obligation shall be made without the express written consent of such Indemnified Party. Such defense shall be controlled by the indemnifying party, and the cost of such defense shall be borne by it, except that such Indemnified Party shall have the right to participate in such defense at its own expense. The Indemnified Party agrees that it will cooperate in all reasonable respects in the defense of any such claim or demand, including making personnel, books, and records relevant to the claim available to the indemnifying party without charge except for reasonable out-of-pocket expenses. If the indemnifying party fails to take such action within 15 business days as set forth above, then such Indemnified Party shall have the right (but not the obligation) to pay, compromise, or defend any Third Party Claim and to recover the amount of any payment on the Third Party Claim from the indemnifying party, plus the expense of defense or settlement. Such Indemnified Party shall also have the right (but not the obligation) to take such action as may be necessary to avoid a default prior to the assumption of the defense of the Third Party Claim by Seller, and any expenses incurred by the Indemnified Party with respect to such action promptly shall be paid or reimbursed by the indemnifying party.

(d)     All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for tax purposes, unless otherwise required by law.

(e)     The provisions of this Section 8 shall survive the expiration or any termination of this Agreement but shall only be limited to the survival of the representations and warranties so stated above.

(f)     Seller's Threshold and Cap.  Seller shall not be obligated to provide any Indemnification for Losses pursuant to claims for breaches of representations and warranties unless the aggregate amount of Losses incurred by Purchaser with respect to such breaches of representations and warranties exceeds the Threshold of $10,000 . Where the Losses exceed the Threshold, in which case Buyer will be liable for the full amount of such Losses without regard to the Threshold and the Seller's aggregate liability to provide Indemnification for Purchaser's Losses shall not exceed the Cap of $55,000

9.     Information Acknowledgement; Disclaimer and Release of Broker. Purchaser and Seller acknowledge that the delivery of any information (the

"*Information*") relating to the Business has not been verified or audited by Alliant Capital Advisors ("*Broker*"), and Broker makes no warranties or representations concerning the accuracy of the Information. Purchaser acknowledges that Broker has advised Purchaser to, and Purchaser understands that before it made any decisions based upon the Information Purchaser did, exercise due diligence through Purchaser's own independent investigation or through the retention of an appropriate professional or expert to verify and evaluate the Information. Purchaser and Seller further acknowledge that they will not rely upon any advice, statements or opinions of any kind, either verbally or in writing, of Broker or its agents, in connection with the purchase and sale of the Business or Assets. Purchaser and Seller release Broker and its respective agents and representatives of any and all claims arising from or relating to the Information.

10.     Non-Competition. Seller acknowledges and agrees that Purchaser would be damaged irreparably if Seller were to provide services to, or otherwise participate in, the business of any person competing with the Business, and that any such competition would result in a significant loss of goodwill by Purchaser. Seller hereby further acknowledges and agrees that the covenants and agreements set forth in this Section 10 were a material inducement to Purchaser to enter into this Agreement and to perform its obligations hereunder. In further consideration of the amounts to be paid hereunder for the Assets, therefore, Seller agrees as follows:

        (a)     Restrictive Covenant. From and after the Closing and until the fifth (5th) anniversary of the Closing Date (the "*Restricted Period*"), Seller shall not (other than for or on behalf of Purchaser), within a 500-mile radius of the Business, directly or indirectly own, manage, control, participate in, consult with, render services for, or in any other manner engage in, any bridal business. The Restricted Period shall be extended for any periods of violation or periods of time required for litigation to enforce the covenants set forth in this Section 10 only if the Seller is found to be in violation of this Section 10. If Seller is found not to be in violation, the time spent litigating shall count towards the Restrictive Period.

        (b)     Non-solicitation Covenant. During the Restricted Period, Seller shall not directly or indirectly (i) induce or attempt to induce (or attempt to interfere with) any employment or engagement relationship with) any employee or independent contractor of Purchaser to leave the employ or engagement of Purchaser, (ii) hire or engage any person who was an employee or independent contractor of Purchaser or of Seller with regard to the Business at any time during the one-year period immediately prior to the date on which such hiring or engagement would take place, (iii) induce or attempt to induce any customer or other business relation of Purchaser to cease doing or decrease business with Purchaser or otherwise take any action that would interfere with, diminish, or impair the valuable relationships that Seller had or that Purchaser had or has with customers of the Business and other business relationships, (iv) cause or authorize any other

person to engage in any of the foregoing; or (v) assist others in engaging in any of the foregoing.

(c)     Restrictions Reasonable. SELLER REPRESENTS THAT IT HAS READ AND CONSIDERED CAREFULLY, AND HAS CONSULTED WITH LEGAL COUNSEL REGARDING, THE PROVISIONS OF THIS AGREEMENT AND, HAVING DONE SO, AGREES THAT THE RESTRICTIONS SET FORTH IN THIS SECTION 10 (INCLUDING WITHOUT LIMITATION THE TIME PERIOD OF THE RESTRICTIONS AND THE GEOGRAPHICAL AREAS OF RESTRICTIONS SET FORTH HEREIN) ARE FAIR AND REASONABLE AND ARE REASONABLY REQUIRED FOR THE PROTECTION OF THE INTERESTS OF PURCHASER.

(d)     Blue Pencil Provision. If any restriction set forth in this Section 10 is found by a court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities, or geographic area for which it may be enforceable.

(e)     Extinguishment of Restrictive Covenants. Where there is a Default under the Secured Promissory Note that is not cured within the required period under the Secured Promissory Note, the Non-Competition restrictions and covenants contained in this Section 10 shall expire immediately having no force or effect.

11.     Purchaser Transition and Training. Seller agrees to be available to transition Purchaser into the Business (a) March 1 through March 3, 2019 in Nashville, (b) one (1) full week of training in Minnesota, (c) five (5) weeks of training and consultation by phone, (d) one (1) day of training at the Chicago Bridal Market, and (e) one (1) of training at the New York Bridal Market.

12.     Confidentiality. From and after the Closing, Seller shall maintain as confidential and shall not use or disclose in any manner information relating to Purchaser or the Business of a nature that Seller knows or reasonably should know, under the circumstances, would be regarded by Purchaser as confidential ("*Confidential Information*") except as necessary to prepare and file tax returns, to exercise rights under this Agreement, as required by law, or as expressly authorized in writing by Purchaser. The foregoing notwithstanding, "Confidential Information" shall not include any information that (i) is or becomes, through no fault of Seller, or its representatives, generally available to and known by the public, or (ii) was disclosed to Seller by a third party not having an obligation of confidence regarding the information. In the event Seller becomes legally compelled to disclose any Confidential Information, Seller shall provide Purchaser with prompt notice thereof and will furnish (or cause its representatives to furnish) only the portion of the Confidential Information that it (or its representatives) is required by such legal compulsion to disclose. Seller also shall exercise (and shall cause its representatives to exercise) reasonable efforts to obtain reasonable

assurance that confidential treatment as provided in this Agreement will be accorded to the Confidential Information so disclosed. The provisions of this Section 12 shall survive the expiration or any termination of this Agreement indefinitely.

13.    Further Assurances. Seller, without additional consideration, shall execute and deliver such further instruments of conveyance and transfer and take such additional action as Purchaser reasonably may request to effect, consummate, confirm, or evidence the transfer to Purchaser of the Assets, and, to the extent provided for herein, the conduct by Purchaser of the Business from and after the Closing, and Seller shall execute such documents as may be necessary to assist Purchaser in preserving or perfecting its rights in the Assets and its ability to conduct the Business. Purchaser and Seller agree to cooperate with each other and to provide each other with all information and documentation reasonably necessary to permit the preparation and filing of all federal, state, local and other tax returns with respect to the Business; provided, however, that each party requesting such information shall reimburse the other party for such other party's reasonable out-of-pocket expenses in connection therewith.

14.    Misdirected Payments; Pre-paid Amounts. Seller shall (i) remit to Purchaser, within three business days of receipt, any amount received or obtained by or on behalf of Seller, that properly should belong to Purchaser and (ii) transfer or deliver to Purchaser within three business days of receipt any other property received, obtained, or found by or on behalf of Seller that is an Asset. Purchaser shall remit to Seller, within three business days of receipt, any amount received or obtained by Purchaser that properly should belong to Seller for sales prior to Closing. At closing, Seller shall credit Purchaser for any deposits Seller has received from customers for products or services that have not been completed or delivered as of the Closing Date.

15.    Miscellaneous.

        (a)    All costs and expenses incurred in connection with this Agreement and the Transaction shall be paid by the party incurring such costs and expenses.

        (b)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors, and assigns.

        (c)    No modification or amendment to this Agreement will be valid or binding unless in writing and duly executed by the party or parties to be bound thereby. The failure of either party at any time to require performance by the other party of any provision of this Agreement shall in no way affect the right of such party to require performance of that provision. Any waiver by either party of any breach of this Agreement shall not be construed as a waiver of any continuing or

succeeding breach of such provision, a waiver of the provision itself, or a waiver of any right under this Agreement.

(d)     If any provision of this Agreement is ruled wholly or partly invalid or unenforceable by an arbitrator, court, or other body of competent jurisdiction, then (i)     the validity and enforceability of all provisions of this Agreement not ruled to be invalid or unenforceable will be unaffected, (ii) the provision held wholly or partly invalid or unenforceable shall be deemed amended, and the arbitrator, court, or other body is authorized to reform the provision, to the minimum extent necessary to render them valid and enforceable in conformity with the parties' intent as manifested herein, and (iii) if the ruling or the controlling principle of law or equity leading to the ruling subsequently is overruled, modified, or amended by legislative, judicial, or administrative action, then the provision in question as originally set forth in this Agreement shall be deemed valid and enforceable to the maximum extent permitted by the new controlling principle of law or equity, with respect, however, only to a cause of action accruing after the effective date of such new controlling principle of law or equity.

(e)     This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee, without regard to conflict of laws provisions.

(f)     Effective as of immediately before the Closing, Seller shall terminate all employees of the Business who are actively at work on the Closing Date. At Purchaser's sole discretion, Buyer or its Affiliates may offer employment, to any or all of such employees.

(g)     All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be given by personal delivery or upon delivery by a recognized overnight courier. Such communications shall be sent to the respective parties at the following addresses (or at such other address for a party as such party may provide by written notice thereof to the other party):

If to Seller:          Marie Suchy
                       801 Lake Street East
                       Wayzata, MN  55391

If to Purchaser:       Jennie M. Dickens
                       221 Winburn Lane
                       Franklin, TN 37069

(g)     This Agreement supersedes all prior agreements with respect to the subject matter hereof and constitutes the entire agreement between the parties hereto with regard to the subject matter hereof.

(h)     Seller stipulates and agrees that any breach of Section 10(a) or Section 10(b) of this Agreement by Seller will result in immediate and irreparable harm to Purchaser for which monetary damages would be inadequate. Purchaser therefore shall have the right to obtain such preliminary, temporary, or permanent injunctions or restraining orders or decrees as may be necessary to protect purchaser against, or on account of, any breach or threatened breach by Seller of the provisions of this Agreement. Such right to equitable relief is in addition to all other legal remedies that Purchaser may have to protect its rights. In the event Purchaser obtains any such injunction, order, decree, or other relief, in law or in equity, Seller shall reimburse Purchaser for all costs associated with obtaining the relief, including without limitation reasonable attorneys' fees and expenses and costs of suit. Seller further covenants and agrees that any order of a court or judgment obtained by Purchaser that enforces Purchaser's rights under this Agreement may be transferred to any court of law or other appropriate law enforcement body located in any other jurisdiction where Purchaser does business, that said court or body may give full force and effect to said order and/or judgment, and that Seller will not object to or oppose any such transfer, implementation, or enforcement of such order or judgment.

(i)     The headings of the sections used in this Agreement are included for convenience only and are not to be used in construing or interpreting this Agreement.

(j)     This Agreement may be executed in separate counterparts, each of which so executed and delivered shall constitute an original, but all such counterparts constitute one and the same instrument. Manually-executed counterparts or counterparts executed by means of an electronic signature may be delivered in faxed or scanned electronic form or by means of such electronic signature service provider, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one counterpart hereof so signed by each of the parties.

**[*Blank Space Prior to Signature Page*]**

## SIGNATURE PAGE

## ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER:

**POSH BRIDAL COUTURE, LLC**

By: _____
Marie Suchy, Manager

PURCHASER:

**OMORFIA VENTURES, INC.**

By: _____
Jennie M. Dickens, President

## EXHIBIT A

### FF&E

[attached]

| Table 1 | | |
|---|---|---|
| **ASSETS** | **ITEM** | **QTY** | |
| Assets | Grey Sofa - originally from ME | 2 | |
| | Tan Sofa - originally from POSH | 2 | |
| | Large Mirror - Originally from ME | 2 | |
| | Medium Mirror – originally from POSH | 2 | |
| | Area Rug | 2 | |
| | Tan Chair- push pin trim | 2 | |
| | SideTables | 3 | |
| | Floor lamps | 4 | |
| | Pedestal Entry Table - Pier 1 | 1 | |
| | Pedestals | 4 | |
| | Glass Containers on front table | 3 | |
| | Miscellaneous office supplies | Envelopes, windex, Clorox wipes, pens, scissors, staples, 3 hole punch | |
| | Miscellaneous picture frames behind desk | 20 | |
| | Yes to the dress sign | 1 | |
| | Manequins | 5 | |
| | Throw pillows | 10 | |
| | Table lamps | 2 | |
| | Off white armless chairs in fitting rooms | 4 | |
| | Round mirror table | 2 | |
| | Tan floral pattern chairs | 3 | |
| | Tan armless chairs | 2 | |
| | Tall metal Accessories stand- front store | 1 | |
| | Tall metal Accessories stand- back store | 1 | |
| | Wine cooler | 2 | |
| | Mini- fridge | 1 | |
| | Mac desk top computer | 1 | |
| | Mac Mouse | 1 | |
| | Managers Lap Top - Apple | 1 | |
| | File cabinet | 2 | |
| | ME drum tables | 2 | |
| | Copier/Printer (leased) | 1 | |
| | Wireless router | 1 | |
| | Credit card machine | 1 | |
| | Copy paper- 1 full box | 1 | |
| | Accessories stand- cream | 1 | |
| | Dress rack- freestanding | 4 | |
| | ME plumber racking for walls | Multiple | |
| | Step ladder | 1 | |
| | Shelving unit in closet | | |
| | Box of light bulbs | | |
| | Rectangle side table | | |
| | Vacuum cleaner | 1 | |
| | Swiffer | 1 | |

**EXHIBIT B**

**Bill of Sale**

[attached]

## BILL OF SALE

POSH BRIDAL COUTURE, LLC, a Minnesota limited liability company ("Seller"), in consideration of $1.00 and other good and valuable consideration, the sufficiency and receipt of which Seller hereby acknowledges, and pursuant to that certain Asset Purchase Agreement dated March 6, 2019 (the "Purchase Agreement"), to which this Bill of Sale is wholly subject, has sold and does hereby assign, transfer and convey to OMORFIA VENTURES, INC. a Tennessee corporation ("Purchaser"), all right, title and interest in and to the Assets of Seller (as defined in the Purchase Agreement). All capitalized terms not otherwise defined herein shall have the same meanings as in the Purchase Agreement.

The Seller makes no other representations or warranties, expressed or implied, except those contained in the Purchase Agreement.

Seller hereby makes, constitutes, and appoints Purchaser (and any officer or agent of Purchaser as it may select in its sole and exclusive discretion) as Seller's true and lawful attorney-in-fact with the power to endorse such party's name on all applications, documents, papers, instruments, and online applications necessary or, in the reasonable opinion of Purchaser, desirable to effectuate the transfer and assignment of the Assets, to grant or issue any exclusive or nonexclusive license to such Assets to any third person, or to take any and all actions necessary for Purchaser to assign, pledge, convey, or otherwise transfer title in or dispose of such Assets or any part thereof or interest therein to any third person, and, in general, to execute and deliver any instruments or documents and do all other acts that Seller is obligated to execute and do hereunder. This power of attorney is coupled with an interest and shall be irrevocable.

This Bill of Sale shall be governed by, and construed and enforced in accordance with, the substantive law of the State of Tennessee other than its conflict of laws provisions. Any suit or legal action in connection with this Assignment shall be brought in the courts sitting in Davidson County, Tennessee.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed as of March 6, 2019.

SELLER:                                          PURCHASER:

**POSH BRIDAL COUTURE, LLC**              **OMORFIA VENTURES, INC**

By: _Marie Suchy_                          By: _Jennie M Dickens_
Marie Suchy, Manager                       Jennie M. Dickens, President

Posh Bridal Couture
Bill of Sale

**EXHIBIT C**

**Closing Statement**

[attached]

# CLOSING STATEMENT

Purchaser: Omorfia Ventures, Inc.

Seller: Posh Bridal Couture, LLC

Closing Date: March 6, 2019

The undersigned hereby acknowledge that they have authorized the disbursement of the following money to the payees named below for the purposes herein below stated:

|  | **Purchaser** | **Seller** |
|---|---|---|
| Purchase Price | $ 511,654.00 | $ 511,654.00 |
| Deposit | $ (10,000.00) | |
| Seller Commission to Alliant Capital Advisors | | $ (42,874.00) |
| Transfer of customer deposits | $ (71,263.00) | $ (71,263.00) |
| Seller Financing | $ (75,000.00) | $ (75,000.00) |
| 2018 Davidson County taxes | | $ (522.71) |
| 2016 Davidson County taxes (estimate) | | $ (1,400.00) |
| Doc Prep, Escrow, Closing - Todd Jackson | $ 750.00 | $ (750.00) |
| Cash from Purchaser / to Seller: | $ 356,141.00 | $ 319,844.29 |

PURCHASER:

Omorfia Ventures, Inc.

By: _Jennie M Dickens_
Jennie M. Dickens, President

SELLER:

Posh Bridal Couture, LLC

By: _Marie Suchy_
Marie Suchy, Manager

# EXHIBIT D

## Secured Promissory Note

[attached]

## SECURED PROMISSORY NOTE
### ("Note")

March 6, 2019                                                              $75,000.00
Nashville, Tennessee

     1.    FOR VALUE RECEIVED, the undersigned, Omorfia Ventures, Inc., a Tennessee corporation ("Obligor"), promises to pay to the order of Posh Bridal Couture, LLC, a Minnesota limited liability company, or its successors or assigns ("Payee"), on or before May 1, 2022 (the "Maturity") the principal sum of SEVENTY-FIVE THOUSAND and 00/100 DOLLARS ($75,000.00). The indebtedness outstanding hereunder from time to time prior to Maturity shall bear interest from the date hereof at the fixed rate of Six and 00/100 percent (6.0%) per annum, and after maturity (except in the case of an extension in writing of the Maturity) at the rate of ten percent (10.0%) per annum (the "Default Rate") until paid in full.

     Obligor shall pay the principal sum owing hereunder in equal monthly installments of Two Thousand Two Hundred Eighty-One and 65/100 Dollars ($2,281.65), on the fifteenth day of each month beginning May 15, 2019 (or on the next business day if such first day falls on a weekend or a federal holiday) until the principal sum and interest hereunder have been paid in full.

     This Note has been executed and delivered pursuant to and in accordance with the terms and conditions of that certain Asset Purchase Agreement, dated March 6, 2019, by and between Obligor and Payee ("the Purchase Agreement") and that certain Security Agreement, dated March 6, 2019, by and between Obligor and Payee ("the Security Agreement"). Any discrepancies between the terms of the Purchase Agreement and this Note shall be resolved in favor of this Note. Any discrepancies between or among the terms of the Security Agreement and/or the terms of this Note or the Purchase Agreement shall be resolved in favor of the Security Agreement.

     2.    All payments under this Note shall be delivered to Payee at 810 Lake Street East, Wayzata, MN 55391, or such other address as Payee may specify from time to time in writing to Obligor.

     3.    All payments on account of the indebtedness evidenced by this Note first shall be applied to Enforcement Expenses (as defined in Section 4 hereof), if any, then to interest on the unpaid principal balance and the remainder to principal. This Note may be prepaid in whole or in part at the option of the undersigned at any time, without premium, penalty, or notice.

     4.    If Obligor shall fail to pay to Payee any amount due Payee pursuant to the terms of this Note and such failure shall continue for five (5) days after the due date therefor, then this Note shall be in default and Payee may at any time thereafter (unless the default shall have been cured) declare the unpaid principal balance and all interest accrued and unpaid thereon immediately due and payable without demand or notice thereof. In addition, this Note shall be in default and shall be and become immediately due and payable, without demand or notice, in the event of any assignment for the benefit of creditors of, or the commencement of any bankruptcy, receivership, insolvency, or reorganization proceeding by or against Obligor. Upon any default, Obligor shall pay upon demand, in addition to the principal and interest accrued hereon, all attorneys' fees and expenses plus all other costs and expenses of collection or attempted collection and enforcement,

including, but not limited to, any fees incurred in connection with such proceedings or collection of this Note and/or enforcement of the rights of Payee with respect to the administration, supervision, preservation or protection of, or realization upon, any property securing payment hereof (collectively, "Enforcement Expenses").

5.     Anything to be done by Payee under this Note, including, without limitation, any waiver, modification or amendment of any provision of this Note or the enforcement of the rights of Payee hereunder shall be in writing. Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

6.     Obligor waives demand, notice of demand, notice of dishonor, presentment, protest and all other notices and defenses, which it may have in law or in equity in connection with the enforcement of this Note. Any failure of Payee to exercise any right available pursuant to the enforcement of this Note, and any delay in such exercise, shall not be construed as a waiver of the right to exercise the same or any other right at any other time.

7.     The parties hereto intend and believe that each provision of this Note comports with all applicable local, state and federal laws and judicial decisions. However, if any provision or provisions, or if any portion of any provision or provisions, in this Note is found by a court of competent jurisdiction to be in violation of any applicable local, state or federal law or public policy, and if such court should declare such portion, provision or provisions of this Note to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Note shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and that the rights, obligations and interest of the undersigned and Payee under the remainder of this Note shall continue in full force and effect.

8.     All agreements herein are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to Payee for the use, forbearance or detention of the money advanced hereunder exceed the highest lawful rate permissible under applicable usury laws. If, from any circumstances whatsoever, fulfillment of any provision hereof at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, notwithstanding anything else contained herein, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstance Payee shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest.

9.     This Note shall bind Obligor and its successors and assigns. This Note may be assigned, negotiated or otherwise transferred in whole or in part by Payee without notice to, or the consent of, Obligor.

10.    (a) As security for the prompt and complete payment and performance in full of Obligor's obligations under this Note, Obligor hereby grants, assigns, pledges, transfers and sets

2

over unto Payee, its successors and assigns and each holder from time to time of this Note, a first priority security interest in and continuing lien on the assets set forth as collateral in the Security Agreement, together with all proceeds, products and profits thereof and substitutions and replacements therefor (collectively, the "Collateral").

(b) Obligor covenants that (i) Obligor will not sell, assign or transfer the Collateral or any part thereof without the express prior written consent of the holder of this Note, (ii) Obligor will not grant, create, suffer or permit any security interest, mortgage, pledge, lien or encumbrance ("Encumbrance") of any nature (even if the Encumbrance is subordinate to the security interest in favor of the holder of this Note) to arise or attach to the Collateral or any part thereof, other than in favor of the holder of this Note, (iii) should any such adverse Encumbrance arise, Obligor shall promptly cause such adverse Encumbrance to be satisfied and discharged, (iv) Obligor shall immediately notify the holder of this Note of any change in Obligor's place of business or of the opening of any additional places of business, and (v) Obligor promptly upon demand shall furnish the holder of this Note with such further information and execute and deliver to said holder such documents and do such acts and things as said holder shall request in order to establish and continuously maintain a first perfected security interest in the Collateral in favor of said holder.

(c) At any time that this Note is in default (within the meaning of the term "default" as used in Section 4 of this Note), the holder of this Note at its sole election may take any and all actions and exercise any and all rights and remedies in respect of the Collateral that are available under the Uniform Commercial Code as then in effect in the State of Tennessee or any successor statute thereto or otherwise are available under Tennessee law. All out of pocket expenses incurred by the holder in exercising such rights and remedies shall be deemed to be Enforcement Expenses.

11. This Note has been delivered and accepted at Nashville, Tennessee, and shall be interpreted, and the rights and liabilities of the parties hereto determined, in accordance with the internal laws of the State of Tennessee (without regard to such State's conflict of law rules). All disputes arising out of or relating to this Agreement shall be subject to the exclusive jurisdiction and venue of the state and federal courts located in Hennepin County, Minnesota. The parties consent to the personal and exclusive jurisdiction and venue of those courts, and Secured Party and Debtor each waives any objection based on lack of personal jurisdiction, improper venue or forum non-conveniens with respect to actions or proceedings in such courts. Notwithstanding the foregoing, the final judgment of any federal or state court located in Minnesota may be enforced in any other jurisdiction where a party or its assets are present.

*[Blank space before signatures on page following]*

3

Signed at Nashville, Tennessee on the date first above written.

**OBLIGOR:**

OMORFIA    VENTURES,    INC.

**ACCCEPTED BY PAYEE:**

POSH BRIDAL COUTURE, LLC

By: _____
       Jennie M. Dickens, President

By: _____
       Marie Suchy, Managing Member

4

## EXHIBIT E

## Security Agreement

[attached]

# SECURITY AGREEMENT

This Security Agreement (the "Agreement") is made as of March 6, 2019, between Omorfia Ventures, Inc., a Tennessee corporation ("Debtor"), and Posh Bridal Couture, LLC, a Minnesota limited liability company ("Secured Party").

In consideration of the agreements set forth herein and in that certain Secured Promissory Note ("Note") of even date herewith between Secured Party and Debtor, the parties agree as follows:

1.     <u>Definitions</u>. The following terms are defined as set forth below.

    (a)     "Liabilities" are all payments and other obligations from time to time due or owing to Secured Party by Debtor under the Note.

    (b)     "Collateral" means all of the assets described in **Exhibit A**, attached hereto.

2.     <u>Ancillary Agreements</u>. In addition to the Note, Obligor and Secured Party are parties to a certain Asset Purchase Agreement, dated March 6, 2019 ("the <u>Purchase Agreement</u>"). Any discrepancies between the terms of this Security Agreement and the terms of the Note or the Purchase Agreement shall be resolved in favor of this Agreement.

3.     <u>Grant of Security Interest</u>. As security for the performance and payment of the Liabilities, Debtor hereby assigns, grants, conveys, mortgages, hypothecates, pledges, and sets over to Secured Party a continuing first priority security interest for the use and benefit of Secured Party in the Collateral (the "Security Interest"). The Security Interest granted herein shall terminate upon satisfaction in full by Debtor of all of the terms and conditions of the Note and this Agreement. Upon termination, the Security Interest shall be of no further force and effect, and the Secured Party shall thereafter have no interest or any other rights in the Collateral by virtue of the grant of the Security Interest herein.

4.     <u>Representations and Warranties</u>. Debtor represents, warrants, and agrees that: (i) no financing statement or other lien notice covering any portion of the Collateral is on file in any public office; (ii) Debtor is and at all times will be the lawful owner of all Collateral, free of all liens and claims whatsoever; (iii) Debtor has full power and authority to execute this Agreement and to perform Debtor's obligations hereunder, and to subject the Collateral to the Security Interest; (iv) all written information heretofore or hereafter furnished by Debtor to Secured Party with respect to the Collateral is and will be true and correct in all respects as of the date furnished; (v) the locations of the Collateral (the "Locations") include the address at which any portion of the Collateral is located and Debtor will immediately notify Secured Party of any other location at which any portion of the Collateral is hereafter located; and (vi) there is no litigation or regulatory complaint against Debtor or affecting or relating to the Collateral or any portion thereof which is pending or threatened as of this date.

5.     <u>Agreements of Debtor</u>. Debtor will from time to time, as Secured Party may request, deliver to Secured Party such schedules and such certificates and reports respecting the Collateral to such extent as Secured Party may request. Any such schedule, certificate or report shall be executed by an authorized officer of Debtor and shall be in such form and detail as Secured

Party may specify. Debtor shall immediately notify Secured Party of the occurrence of any event causing a material loss or depreciation in the value of any item of Collateral, and the amount of such loss or depreciation. Further, Debtor (i) will, upon request of Secured Party, execute such financing statements and other documents (and pay the cost of filing or recording the same), and do such other acts and things as Secured party may from time to time request to establish and maintain valid perfected first priority security interests in the Collateral; (ii) will keep all items of Collateral in good condition and repair at the Locations; (iii) will keep its records concerning all items of Collateral at the Locations, which records will be of such character as will enable Secured Party to determine at any time the status thereof; (iv) will furnish Secured Party such information concerning Debtor and the Collateral as Secured Party may from time to time request; (v) will permit Secured Party or its designees, at all times, to inspect the Collateral, and to inspect, audit and make copies of and extracts from all records and all other papers in the possession of Debtor, and will, upon request of Secured Party, deliver to Secured Party all of such records and papers that pertain to the Collateral; (vi) will, upon request of Secured Party, stamp on its records concerning the Collateral (and/or enter in its computer records concerning the Collateral) a notation, in form satisfactory to Secured Party, of the security interests of Secured Party hereunder; (vii) except as consented to in writing by Secured Party, will not sell, lease, assign or create or permit to exist any lien on or security interest in any item of Collateral to or in favor of anyone other than Secured Party and the Prior Lender; (viii) will furnish to Secured Party no less than thirty (30) days prior to the occurrence of any change in the Locations or in Debtor's name, notice in writing of such change; (ix) will at all times for the duration of the Note and this Agreement keep the Collateral insured in commercially amounts and type of insurance coverage; and (x) will reimburse Secured Party for all expenses, including reasonable attorneys' fees and legal expenses, incurred by Secured Party in seeking to collect or enforce any rights under this Agreement or the Note.

6.    Remedies. Whenever Debtor shall fail to perform any obligation in the manner and at the time required under this Agreement or the Note, taking into account any applicable grace period(s) (an "event of default"), Secured Party may exercise any rights and remedies available to it under this Agreement, the Note, and applicable law. Upon the occurrence of an event of default, Secured Party may, to the fullest extent permitted by applicable law, without notice, advertisement, hearing or process of law of any kind, (i) enter upon any premises where any of the Collateral may be located and take possession of and remove such Collateral, (ii) sell any or all of the Collateral, free of all rights and claims of Debtor therein and thereto, at any public or private sale, and (iii) bid for and purchase any or all of the Collateral at any such sale. Debtor hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, advertisements, hearings or process of law in connection with the exercise by Secured Party of any of its rights and remedies upon an event of default. Any notification of the intended disposition of any of the Collateral required by law shall be deemed reasonably and properly given if given at least ten (10) days before such disposition. Any proceeds of any disposition by Secured Party of any of the Collateral will be applied by Secured Party in the following order: First, to payment of Secured Party's reasonable out-of-pocket expenses in connection with the Collateral and the enforcement of Secured Party's rights with respect thereto or hereunder, including reasonable attorneys' fees and legal expenses; second, toward the payment or satisfaction of the Liabilities in full; and, third, any surplus shall be paid to Debtor, its successors and assigns, or as a court of competent jurisdiction may otherwise direct.

7.    Costs. Debtor shall pay the filing and recording costs of any documents or instruments necessary to perfect, extend, modify, or terminate the Security Interest created

2

hereunder, as demanded by the Secured Party. Debtor shall further pay all expenses and reimburse the Secured Party for any expenditures, including reasonable attorneys' fees and legal expenses, in connection with any exercise by the Secured Party of its rights and remedies hereunder.

8.  Miscellaneous.

(a)  Entire Agreement; Amendments. This Agreement, the Note and the Purchase Agreement contain the entire understanding of the parties with respect to the subject matter hereof. No amendment to or modification of this Agreement will be valid unless in writing and signed by both parties hereto. This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors in interest, permitted assigns and legal representatives. This Agreement is the "Security Agreement" referred to in the Note.

(b)  Cumulative Rights; Waiver. All rights and remedies conferred upon the Secured Party hereby are in addition to and cumulative with those granted to it in any other agreement or by the Uniform Commercial Code or any other law. No acquiescence in or waiver of any non-compliance by Secured Party with the terms and conditions hereof or any default by Debtor hereunder shall constitute or be construed as a waiver by Secured Party of any subsequent non-compliance or default by Debtor or of any non-compliance or default by Debtor with respect to any other provision of this Agreement.

(c)  Further Assurances. From and after the date hereof, Debtor shall execute all documents and take such other actions as Secured Party may from time to time request in order to carry out the transactions provided for herein and accomplish the purposes contemplated hereby.

(d)  Notices. All notices, demands, and other communications under this Agreement shall be in writing and shall be deemed properly served when personally delivered to the party to whose attention it is directed, addressed as follows:

If to Secured Party, at:

801 Lake Street East
Wayzata, MN 55391

If to Borrower, at:

221 Winburn Lane
Franklin, TN 37069

or to such other address which either party designates to the other by notice duly given.

3

(e)     <u>Governing Law; Venue</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee, subject, however, to the Uniform Commercial Code of any applicable jurisdiction. Except for actions for specific performance or other actions which must be brought in jurisdictions other than the State of Minnesota, all disputes arising out of or relating to this Agreement shall be subject to the exclusive jurisdiction and venue of the state and federal courts located in Hennepin County, Minnesota. The parties consent to the personal and exclusive jurisdiction and venue of those courts, and Secured Party and Debtor each waives any objection based on lack of personal jurisdiction, improper venue or forum non-conveniens with respect to actions or proceedings in such courts. Notwithstanding the foregoing, the final judgment of any federal or state court located in Minnesota may be enforced in any other jurisdiction where a party or its assets are present.

(f)     <u>Continuing Agreement</u>. This Agreement shall in all respects be a continuing agreement, and shall remain in full force and effect until final payment of all the Liabilities.

(g)     <u>Counterparts</u>. This Agreement may be executed in separate counterparts, each of which so executed and delivered shall constitute an original, but all such counterparts constitute one and the same instrument. Manually-executed counterparts or counterparts executed by means of an electronic signature may be delivered in faxed or scanned electronic form or by means of such electronic signature service provider, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one counterpart hereof so signed by each of the parties.

*[Blank space before signatures on page following]*

4

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SECURED PARTY:

**POSH BRIDAL COUTURE, LLC**

By: _____
Marie Suchy, Managing Member

DEBTOR:

**OMORFIA VENTURES, INC.**

By: _____
Jennie M. Dickens, President

5

## Exhibit A

The security interest is granted in the following personal property, tangible or intangible, and fixtures in which Omorfia Ventures, Inc. (the "Debtor") has an interest, including but not limited to:

(a) All machinery, equipment, fixtures, appliances and furniture now owned or hereafter acquired by the Debtor and wherever located;

(b) All inventory now owned or hereafter acquired and the products and proceeds thereof, including raw materials, components, work-in process, finished merchandise and packing and shipping materials;

(c) All accounts, contract rights, and accounts receivable now or hereafter in existence, and all proceeds thereof, and all returned or repossessed goods rising from or relating to any of said accounts or rights;

(d) All investment accounts, chattel paper, securities, money, instruments, deposits, credits, claims and *choses in action*;

(e) All substitutes and replacements for, accessions, attachments, and other additions to, and tools, parts, equipment and manuals used in connection with any of the above;

(f) All property similar to the above hereafter acquired by the Debtor and wherever located;

(g) )The phone number (629) 888-4532, the Facebook page located at https://www.facebook.com/pbcnashville,) all customer records and contracts; all software licenses, trade secrets, know-how, and intellectual property, including a license to use the name Posh Bridal Couture, and all general intangibles, now owned or hereafter acquired or arising;

(h) All cash or non-cash proceeds of any of the foregoing, including insurance proceeds; and

(i) All ledger sheets, files, records, documents, and instruments (including, but not limited to, computer programs, tapes, related electronic data processing software and all documentation relating thereto) evidencing an interest in or relating to all of the above.

6

**EXHIBIT F**

**<u>Guaranty</u>**

[attached]

# GUARANTY

THIS GUARANTY (as it may be amended or modified and in effect from time to time, this "Guaranty") is made as of March 6, 2019 ("Effective Date") by Jennie M. Dickens and Mark W. Dickens (the "Guarantor"), in favor of Posh Bridal Couture, LLC, a Minnesota limited liability company (the "Company"). Unless otherwise defined herein, capitalized terms used herein and not defined herein shall have the meanings ascribed to such terms in the Secured Note (as defined below).

RECITALS

WHEREAS, Omorfia Venutres, Inc., a Tennessee corporation (the "Purchaser") and the Company have entered into a certain Asset Purchase Agreement, dated as of March 6, 2019 (as amended or modified and in effect from time to time, the "Purchase Agreement", a copy of which is attached to this Guaranty as Exhibit A); and

WHEREAS, pursuant to the Purchase Agreement, the Company has extended credit to Purchaser in the amount of One Hundred Thousand Dollars $75,000, in the form of a Secured Promissory Note, a copy of which is attached to this Guaranty as Exhibit B (the "Secured Note"); and

WHEREAS, Guarantors are officers and principals of the Purchaser; and

WHEREAS, it is a condition precedent to the extension of credit under the Purchase Agreement, and to the closing of the Purchase Agreement, that Guarantor personally guarantee the obligations of the Purchaser under the Purchase Agreement and the Secured Note;

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Guaranty.

(a)    Guaranty.  The Guarantor hereby irrevocably and unconditionally guarantees the payment to the Company of amounts due under the Purchase Agreement and Secured Note (the "Loan Amount"), where the Company exercises its rights under the Purchase Agreement and, upon the occurrence of an Event of Default, under the Secured Note, including but not limited to nonpayment of principal, interest and/or Enforcement Expenses, if any.

(b)    Continuing Guaranty.  This Guaranty is a continuing guaranty and shall remain in effect until all obligations of the Purchaser under the Purchase Agreement and Secured Note have been paid in full.

2.    Guaranty Unconditional.  Notwithstanding anything herein to the contrary, the obligations of the Guarantor hereunder are unconditional and absolute, and, without

limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by any of the following:

(a) any extension, renewal, settlement, indulgence, compromise, waiver or release of or with respect to the Loan Amount or any of Company's obligations under the Purchase Agreement and Secured Note, or with respect to any obligation of any other guarantor, obligor, surety, endorser, accommodating party or any other person or entity liable for any obligations under the Purchase Agreement and/or Secured Note, whether by operation of law or otherwise, or any failure or omission to enforce any right, power or remedy with respect to the Purchase Agreement and/or Secured Note, or with respect to any obligation of any other obligor.

(b) any modification or amendment of or supplement to the Secured Note or the Purchase Agreement, or any other loan document (collectively, the "Loan Documents"), including, without limitation, any such amendment which may increase the amount of, or the interest rates applicable to, the Loan Amount;

(c) any release, surrender, compromise, settlement, waiver, subordination or modification, with or without consideration, of any collateral securing the Loan Amount or any part thereof, or any nonperfection or invalidity of any direct or indirect security for the Loan Amount;

(d) any change in the corporate, partnership, limited liability company or other existence, structure or ownership of the Company, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Company or the Loan Amount, or any of their respective assets, or any resulting release or discharge of any obligation of the Company;

(e) the existence of any claim, setoff or other rights which the Guarantor may have at any time against the Company or any other person, whether in connection herewith or in connection with any unrelated transactions, provided that nothing herein shall prevent the assertion of any such claim by separate suit or compulsory counterclaim;

(f) election by, or on behalf of the Company, in any proceeding instituted under Chapter 11 of Title 11 of the United States Code (11 U.S.C. 101 et seq.) (or any successor statute, the "Bankruptcy Code"), of the application of Section 1111(b)(2) of the Bankruptcy Code;

(g) any borrowing or grant of a security interest by the Company, as debtor-in-possession, under Section 364 of the Bankruptcy Code;

(h) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of the claims of the Company for repayment of all or any part of the Loan Amount; or

(i) any other act or omission to act or delay of any kind by the Company, or any other person or any other circumstance whatsoever which might, but for the provisions of this Section 2, constitute a legal or equitable discharge of the Guarantor's obligations hereunder, or otherwise reduce, release, prejudice or extinguish the Guarantor's liability under this Guaranty.

3. <u>Discharge Only Upon Payment in Full; Reinstatement in Certain Circumstances</u>. The Guarantor's obligations hereunder shall remain in full force and effect until the Company's obligations under the Purchase Agreement and Secured Note shall have been indefeasibly paid in full in cash and released.

4. <u>Representations, Warranties and Covenants</u>. The Guarantor represents and warrants to the Company as of the date of this Guaranty, giving effect to the consummation of the transactions contemplated by the Purchase Agreement and Secured Note, and all other documents executed on the Effective Date, that:

(a) The Guarantor has the power and authority and legal right to execute and deliver this Guaranty and to perform his obligations hereunder. The execution and delivery by Guarantor of this Guaranty and the performance of his obligations hereunder have been duly authorized, and this Guaranty constitutes a legal, valid and binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

(b) Neither the execution and delivery by Guarantor of this Guaranty, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof, will violate (i) any law, rule, regulation, order, writ, judgment, injunction, decree or award binding on the Guarantor, or (ii) the provisions of any indenture, instrument or agreement to which the Guarantor is a party or is subject, or by which he, or his property, is bound, or conflict with or constitute a default thereunder, or result in, or require, the creation or imposition of any lien in, of or on the property of the Guarantor pursuant to the terms of any such indenture, instrument or agreement.

(c) No order, consent, adjudication, approval, license, authorization, or validation of, or filing, recording or registration with, or exemption by, or other action in respect of any governmental or public body or authority, or any subdivision thereof, which has not been obtained by the Guarantor, is required to be obtained by the Guarantor in connection with the execution and delivery of this Guaranty, or the legality, validity, binding effect or enforceability of this Guaranty.

5. <u>Waivers</u>. Notwithstanding anything herein to the contrary but subject to the limitations of this Guaranty, the Guarantor hereby absolutely, unconditionally, knowingly, irrevocably and expressly waives, to the fullest extent permitted by law:

(a) acceptance hereof, presentment, demand or action on delinquency, protest, the benefit of any statutes of limitations and, to the fullest extent permitted by law, any notice not provided for herein;

(b) (i) notice of any loans, or any other financial accommodations made or extended to Company; (ii) notice of the amount of the Loan Amount; (iii) notice of any adverse change in the financial condition of the Borrower or of any other fact that might increase the Guarantor's risk hereunder; (iv) notice of presentment for payment, demand, protest, and notice thereof as to any instruments contemplated hereunder; (v) notice of any default or event of default; and (vi) all other notices (except if such notice is expressly required to be

Case 3:19-cv-00794   Document 1-1   Filed 09/11/19   Page 39 of 47 PageID #: 51

given to the Guarantor hereunder) and demands to which the Guarantor might otherwise be entitled;

(c)     his right, if any, to require the Company to institute suit against, or to exhaust any rights and remedies which the Company has or may have against any third party, or against any other collateral securing the amount due under the Purchase Agreement and Secured Note, and the Guarantor further waives any defense arising by reason of any disability or other defense;

(d)     (i) any rights to assert against the Company any defense (legal or equitable), set-off, counterclaim, or claim which the Guarantor may now or at any time hereafter have against any other obligor or any other party liable to the Company; (ii) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Purchase Agreement and Secured Note or any security therefor; (iii) any defense the Guarantor has to performance hereunder, and any right the Guarantor has to be exonerated, arising by reason of (1) the impairment or suspension of the Company's rights; (2) the alteration of the Purchase Agreement and Secured Note; (3) any discharge of any other obligor's obligations to the Company by operation of law as a result of the Company's intervention or omission; or (4) the acceptance by the Company of anything in partial satisfaction of the any collateral; and (iv) the benefit of any statute of limitations affecting the Guarantor's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Loan Amount shall similarly operate to defer or delay the operation of such statute of limitations applicable to the Guarantor's liability hereunder; and

(e)     any defense arising by reason of or deriving from (i) any claim or defense based upon an election of remedies by the Company; or (ii) any election by the Company under the Bankruptcy Code, to limit the amount of, or any collateral securing, its claim against the Guarantor.

6.     Third-Party Beneficiaries. This Guarantee is for the benefit only of the Company, and is not intended to confer upon any other third party any rights or remedies hereunder, and shall not be construed as for the benefit of any other third party.

7.     Stay of Acceleration. If acceleration of the time for payment of any amount payable by the Company under the Purchase Agreement or Secured Note is stayed upon the insolvency, bankruptcy or reorganization of the Company, all such amounts otherwise subject to acceleration under the terms of the Purchase Agreement and Secured Note shall nonetheless be payable by the Guarantor hereunder forthwith on demand by the Company subject to any limitations contained herein.

8.     Notices. All notices, requests and other communications to any party hereunder shall be given in the manner prescribed in the Purchase Agreement and Secured Note with respect to the Company at its notice address therein and, with respect to the Guarantor set forth on the Signature Page hereof, or such other address or telecopy number as the Guarantor may hereafter specify for such purpose in accordance with the provisions of the Purchase Agreement and Secured Note.

Guaranty
Jennie M. Dickens and Mark W. Dickens
Posh Bridal Couture                                          - 4 -

9.     No Waivers. No failure or delay by the Company in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided in this Guaranty and the Purchase Agreement and Secured Note shall be cumulative and not exclusive of any rights or remedies provided by law.

10.     Successors and Assigns. This Guaranty is for the benefit of the Company and its successors and assigns, provided, that the Guarantor shall have no right to assign his rights or obligations hereunder without the consent of the Company, and any such assignment in violation of this Section 10 shall be null and void *ab initio*; and in the event of an assignment by the Company of any amounts payable under the Purchase Agreement and Secured Note in accordance with the respective terms thereof, the rights hereunder, to the extent applicable to the indebtedness so assigned, may be transferred with such indebtedness. This Guaranty shall be binding upon the Guarantor and his successors and assigns.

11.     Changes in Writing. This Guaranty or any provision hereof may be changed, waived, discharged or terminated only by a written instrument signed by the Guarantor and the Company.

12.     Governing Law; Jurisdiction.

(a)     THIS GUARANTY SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TENNESSEE.

(b)     THE GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE COURTS LOCATED IN HENNEPIN COUNTY, MINNESOTA FOR ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY AND HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION HE MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. NOTHING HEREIN SHALL LIMIT THE RIGHT OF THE COMPANY TO BRING PROCEEDINGS AGAINST THE GUARANTOR IN THE COURTS OF ANY OTHER JURISDICTION. ANY JUDICIAL PROCEEDING BY THE GUARANTOR AGAINST THE COMPANY, DIRECTLY OR INDIRECTLY INVOLVING ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS GUARANTY OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN DESCRIBED IN THE FIRST SENTENCE OF THIS SECTION 12(b).

(c)     The Guarantor irrevocably consents to service of process in the manner provided for notices in Section 8 of this Guaranty, and the Guarantor hereby appoints the Company as his agent for service of process. Nothing in this Guaranty or any other Loan Document

will affect the right of any party to this Guaranty to serve process in any other manner permitted by law.

13.   **WAIVER OF JURY TRIAL. THE GUARANTOR HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS GUARANTY OR THE RELATIONSHIP ESTABLISHED HEREUNDER.**

14.   No Strict Construction.   The parties hereto have participated jointly in the negotiation and drafting of this Guaranty. In the event an ambiguity or question of intent or interpretation arises, this Guaranty shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Guaranty.

15.   Expenses of Enforcement. The Guarantor agrees to reimburse the Company for any costs and out-of-pocket expenses (including attorneys' fees) paid or incurred by the Company in connection with the collection or enforcement of the amounts due hereunder.

16.   Counsel. GUARANTOR ACKNOWLEDGES THAT HE HAS BEEN ADVISED TO SEEK HIS OWN INDIVIDUAL COUNSEL FOR PURPOSES OF DUE DILIGENCE AND PROTECTING HIS INTERESTS IN ENTERING INTO THIS GUARANTY, AND HE HAS EITHER DONE SO OR MADE A CONSIDERD DECISION TO FOREGO SUCH COUNSEL.

17.   Financial Information. The Guarantor hereby assumes responsibility for keeping hiself informed of the financial condition of the Company and any other obligors, and of all other circumstances bearing upon the risk of nonpayment of the Loan Amount, or any part thereof, that diligent inquiry would reveal, and the Guarantor hereby agrees that the Company shall not have any duty to advise the Guarantor of information known to the Company regarding such condition or any such circumstances.

18.   Severability.   Wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

19.   Merger. This Guaranty represents the final agreement of the Guarantor with respect to the matters contained herein and may not be contradicted by evidence of prior or contemporaneous agreements, or subsequent oral agreements, between the Guarantor and the Company.

20.   Headings. Section headings in this Guaranty are for convenience of reference only and shall not govern the interpretation of any provision of this Guaranty.

21. <u>Execution in Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

22. <u>Electronic Signatures</u>. Each party agrees that the electronic signatures, whether digital or encrypted, of the parties included in this Guaranty are intended to authenticate this writing and have the same force and effect as manual signatures. Electronic signature means any electronic symbol or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including, without limitation, Adobe e-signature, DocuSign, E-sign, facsimile, or e-mail electronic signatures.

*[Blank Space Prior to Signature Page]*

## SIGNATURE PAGE

## GUARANTY

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty to be duly executed as of the Effective Date as first above written.

**GUARANTOR:**

Jennie Dickens

Address:

221 Winburn Lane, Franklin, TN 37069

Mark W. Dickens

Address:

221 Winburn Lane, Franklin, TN 37069

Guaranty
Jennie M. Dickens and Mark W. Dickens
Posh Couture, LLC

## GUARANTY

## EXHIBIT A

### Purchase Agreement

[attached]

## GUARANTY

## EXHIBIT B

## Secured Promissory Note

[attached]

## SCHEDULE 5(o)

### Assigned Contracts